**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| SUSAN YODER,<br><br>Plaintiff,<br><br>v.<br><br>DOLGENCORP, LLC, et al.,<br><br>Defendants. | CASE NO. 1:24-CV-171-HAB |

# OPINION AND ORDER

Plaintiff Susan Yoder ("Yoder") worked for Defendant Dolgencorp, LLC ("Dollar General") at its in Berne, Indiana location for nearly three decades, before Dollar General terminated her. She sued Dollar General and its District manager, Jeannie Deller (individually, "Deller" and collectively, "Defendants") for violation of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA").

Yoder moves for partial summary judgment to establish the Defendants' liability for her ADA claim. (ECF 70). Defendants move for summary judgment in full. (ECF 77). All motions are fully briefed and ripe for ruling. (ECF 102, 107, 114, 119). For the reasons below, Yoder's motion will be DENIED and Defendants' motion will be GRANTED.

## FACTUAL BACKGROUND

### I. Yoder's Job and Duties

The following material facts are undisputed:[1] Yoder began working for Dollar General as a Store Manager Trainee at its Berne, Indiana location in November 1992. (ECF 82, ¶ 3). She was

---

[1] The cross-motions in this case created largely duplicative briefs, exhibits, and statements of facts. Because Defendants move for summary judgment in full while Yoder only originally sought it in part, the Court cites primarily from filings in the line of briefing for Defendants' motion. Where facts needed for a complete recounting of the record

promoted to Store Manager a few months later and eventually became a Certified Store Manager. (*Id.* ¶¶ 3–4). This role, on top of managing the store more generally, carried several additional duties and essential job functions. (*Id.* ¶ 11). These included requirements that she:

- Ensure that the store is appropriately staffed and effectively opened and closed each day. Personally open the store a minimum of two times per week [and] personally close the store a minimum of two times per week;
- Facilitate the efficient staging, stocking and storage of merchandise by following defined company work processes;
- Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;
- Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and case control procedures;
- Maintain a clean, well-organized store; facilitate a safe and secure working and shipping environment; and
- Follow company policies and procedures as outlined in the Standard Operating Procedures manual, Employee Handbook, and company communications; ensure employee compliance.

(*Id.* ¶ 11).[2]

The job description also includes physical requirements, such as:

- Frequent walking and standing;
- Frequent bending, stooping and kneeling to run check out station, stock merchandise and unload trucks;
- Frequent handling of merchandise and equipment such as hand-held scanner, pricing guns, box cutters, merchandise containers, two-wheel dollies, and U-boats (six-wheel carts);
- Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds;
- Occasional climbing (using ladder); and
- Regularly driving/providing own transportation to make bank deposits and occasionally to attend management meetings and to other Dollar General stores.

---

are not duplicated, the Court cites Yoder's filings accordingly. The Court denies Yoder's cursory request to issue a show cause order to the Defendants for unreasonably multiplying proceedings.

[2] Although Yoder disputes that a Store Manager is required to do all these functions personally, she does not dispute that this accurately reflects Dollar General's job description for Store Manager. (ECF 108, ¶ 11).

(*Id.* ¶ 12).[3]

As Store Manager, Yoder typically managed eight hourly employees. (*Id.* ¶19). She was responsible for scheduling them for work each week within the total work hours allotted to her store. (*Id.* ¶ 28). Because Yoder was on salary, her hours did not count toward this total. (*Id.* ¶ 29). The parties dispute the level of discretion that District Managers and Regional Directors have in deciding how many hours each store gets allocated. (*Id.* ¶¶ 23, 26, 27; ECF 108, ¶¶ 23, 26, 27). She also held one of three key-holding roles. (ECF 82, ¶¶ 20–21). Key holders could open and close the store on their own, access the store's safe, and make bank deposits. (*Id.*).

Yoder knew the details of Dollar General's various company policies and procedures. (*Id.* ¶¶ 13–16). This includes Dollar General's Wage and Hour policy. (*Id.* ¶ 16). That policy notes that working off the clock is a violation of that policy and "can lead to immediate termination even for the first offense," although Yoder disputes that this applied to her as a salaried/non-hourly manager. (*Id.* ¶ 17; ECF 108, ¶ 17).

As a Store Manager, Yoder reported directly to the District Manager. (ECF 82, ¶ 5). Yoder worked under three different District Managers in her final two years of employment: Jin Kwon, Sade Smith ("Smith"), and Deller. (*Id.* ¶¶ 6–7). Smith held the role from mid-2021 until September 2022, at which point Dollar General promoted Deller. (*Id.*).

## II. Yoder's Medical Leave

In June 2021, Dollar General approved a 12-week FMLA leave for Yoder after an injury she suffered developed into cellulitis. (*Id.* ¶¶ 37–38; ECF 108, ¶ 37). Yoder's doctor sent her paperwork for this to Dollar General's third-party administrator Matrix, which handled family and

---

[3] While Yoder contends these are not listed as "essential job functions," (ECF 108, ¶12), the job description lists these as "working conditions and physical requirements" for Store Managers. (ECF 78-1, at 138).

medical leave programs. (ECF 82, ¶ 36). He noted that the injury left Yoder "unable to drive" and that she was "using [a] wheelchair for mobility." (ECF 74, at 5). He had prescribed 4–6 weeks of physical therapy and anticipated a continuous leave that would end in early July. (*Id.*, at 3–5).

Yoder exhausted her 12 weeks of FMLA leave, then took an additional 6-week medical leave of absence that was set to end on October 24. (ECF 82, ¶ 38–39). But Yoder claimed her doctor had not yet cleared her to return to work by the end of the second leave. (*Id.* ¶ 39).[4] So on October 28, Yoder requested that her leave be extended until she was cleared to return. (*Id.* ¶ 40). Smith, then the District Manager, conferred with Dollar General's Employee Relations Manager about this request, which was ultimately granted. (*Id.* ¶¶ 41, 43).

On November 23, Yoder's doctor wrote a note clearing her to return to work on "light duty." (ECF 82, ¶ 44; ECF 72-2, at 92). Upon Yoder's return, Smith met with Yoder to determine what job functions and physical requirements she could still perform with her light duty restriction. (ECF 82, ¶ 45).[5] At the meeting, Smith and Yoder determined the following with respect to a Store Manager's essential job functions and physical requirements:

- **Frequent walking and standing:** "Yes. Can walk with a walker or a shopping cart. Can stand at the register and while stocking shelves."
- **Frequent bending, stooping, kneeling to run register, stock merchandise and unload trucks:** "Yes. Can do all register and stocking duties, but may need to take small sitting breaks throughout the day. Cannot unload trucks or push rolltainers/u-boats that are too heavy."
- **Frequent handling of merchandise and equipment:** "Yes. Can handle all equipment. In regards to U-boats, they must not contain too many boxes that are too heavy."
- **Frequent and proper lifting up to 40 pounds, occasionally up to 55 pounds:** "Can lift up to 25 pounds. Can push or pull loads that are not too heavy."

---

[4] Yoder denies this and claims her leave was approved through November 21. (ECF 108 ¶ 39). Her citation does not support this assertion. (ECF 72-2, 69–70). In fact, it affirms Dollar General's stated timeline. (*Id.*).

[5] Yoder's persistent dispute that "essential job functions" and "physical requirements" were distinct aspects of her job description is noted. (ECF 108, ¶ 45). As the Court later explains, Yoder's argument that her job's physical *requirements* are not essential to her job or distinct from the job description is obtuse and defies common sense.

- **Occasional climbing:** "Has not tried to use a ladder since the injury. But, can use a step stool to assist in placing merchandise on higher shelves."
- **Regular driving / providing own transportation to take bank deposits:** "At this time, she has not been cleared by the doctor to drive. She currently has a dependable driver that assists her daily."

(*Id.* ¶ 46).

She noted no limitations on her ability to open and close the store. (*Id.*). Yoder anticipated the restrictions would only need to be in place for six weeks or less and noted her next doctor's appointment was not until May 2022. (ECF 72-2, at 94). She added that could change if complications arose. (*Id.*). Dollar General approved these accommodations. (ECF 82, ¶ 48).

## III. Yoder's Return to Work

Yoder fully returned to work with accommodations on December 4, 2021. (*Id.* ¶ 49). At some point, she began using a wheelchair at work without informing Dollar General. (*Id.* ¶ 50). She had not disclosed the need to use a wheelchair at work as part of the interactive process. (*Id.*). And her medical condition had not changed since returning to work. (ECF 108, ¶ 53).

In January 2022, Jessica Wehrle ("Wehrle") became Dollar General's Regional Director for the district which contained the Berne store. (*Id.* ¶ 54). That April, Wehrle made her first visit to the Berne store. (*Id.* ¶ 55). While there, she met with Yoder and her Assistant Store Manager Janet Dennison ("Dennison"). (*Id.*). Wehrle says that she observed the store did not comply with Dollar General's expectations in several areas. (*Id.* ¶ 56). She encouraged Smith to address these issues with Yoder. (*Id.* ¶ 56). Yoder and Dennison also both claim that Wehrle kicked Yoder's wheelchair and told her "I don't know how you can do your job in a wheelchair." (ECF 108, Plaintiff's Additional Material Facts, ¶ 4). Wehrle denies this. (ECF 78-10, at 4–5). Neither Yoder nor Dennison filed a formal complaint about this incident. (ECF 78-1, at 36–38; ECF 116-2, at 15–17).

Smith resigned later that year. (ECF 82, ¶ 58). In September 2022, Dollar General promoted Deller to replace her as District Manager. (*Id.* ¶ 59). When Deller took over, Smith shared information on the stores with her. (*Id.* ¶ 60). This included the fact that Yoder's store in Berne, along with 17 others in the district, were "not customer ready." (*Id.*). That same month, a customer submitted a complaint that he couldn't shop at the Berne store because the carts on the floor were full of merchandise and he couldn't move to access the shelves. (ECF 78-11, at 3, 12). Around this time, Wehrle also spoke with Deller about the Berne store often significantly exceeding its budgeted weekly payroll hours. (ECF 82, ¶ 64). Records show the Berne store went over its budgeted hours in all but a handful of weeks between January and October of 2022. (ECF 78-11, at 9–10). Smith also discussed this issue with Deller during the transition (ECF 72-2, at 105). Smith told her that this overscheduling was happening to accommodate the fact Yoder could not drive and was in a wheelchair. (*Id.*).

Soon after her promotion, Deller made her first visit to the Berne store. (ECF 82, ¶ 63). Deller testified that when she made this first visit, the store still did not meet company standards on several levels. (*Id.*). Deller counseled Yoder on the store's condition. (*Id.* ¶ 66). Yoder told Deller during this visit that she needed more hours to perform the store's necessary tasks. (*Id.* ¶ 67). The parties dispute whether Yoder attributed this need to her medical condition or labor needs. (*Id.*; ECF 108, ¶ 67). In either event, Deller contacted Wehrle about Yoder's request to increase her store's labor hour allocation. (ECF 82, ¶ 67). Wehrle told Deller to contact Employee Relations to check on Yoder's existing accommodations. (*Id.*).

Deller and Wehrle contacted Employee Relations to inquire about Yoder's accommodations.[6] On September 30, Employee Relations employee Bob Meyer ("Meyer") emailed Wehrle and Deller to reply to a previous inquiry. (ECF 72-2, at 105–06). Meyer informed them of accommodations put in place for Yoder in December 2021. (*Id.*). He also added:

> With the fact that [Yoder] has not been released to drive…or been able to drive…as well as the fact that a wheel chair exists within the store that she is using at times, we will need for you to work through the ADP-Interactive Process once again in order to update based on restrictions to determine whether or not we would accommodate the restrictions or accommodate through a Leave of Absence.

(*Id.* at 106).

Deller followed up with an email asking for clarifications on next steps. (*Id.*, at 105). Dollar General's Employee Relations Manager Lindsey Herndon ("Herndon") responded on October 10. (*Id.*, at 104–05). Herndon's email affirmed that there was no mention of a wheelchair when they last went through the interactive process. (*Id.*, at 104). Herndon told Deller to call Yoder and talk to her about her restrictions before deciding on new possible accommodations. (*Id.*). Herndon further instructed Deller to review the "Working Conditions & Physical Requirements" section of Yoder's job description with her line-by-line, having Yoder indicate whether she can perform each item based on her restrictions. (*Id.*). Herndon asked to have Yoder explain what accommodation would be needed for any task to which she answers "No" and potential end dates for her restrictions, if applicable. (*Id.*).

The next day, October 11, Deller met with Yoder as instructed and reviewed the job description with her. (ECF 82, ¶ 71). Yoder clarified that she could perform all "Duties and Essential Job Functions" except for personally opening or closing the store at least two times a

---

[6] This inquiry may have occurred before or after Deller's first visit to the Berne store. But because store issues stemming from Yoder's accommodations had been raised to Deller before the visit, whether the visit or the inquiry came first is immaterial.

week. (*Id.* ¶ 73). To that she said, "No, need someone else in store until out of wheelchair." (*Id.*).[7] For the "Working Conditions and Physical Requirements," Yoder identified several she could not do absent accommodation:

- **Frequent walking and standing:** "No can only be out of wheelchair for limited amount of time"
- **Frequent bending, stooping, kneeling to run register, stock merchandise and unload trucks:** "No cannot kneel"

  …
- **Frequent and proper lifting up to 40 pounds, occasionally up to 55 pounds:** "No 25 lb restriction"
- **Occasional climbing:** "No balance issues"
- **Regular driving / providing own transportation to take bank deposits:** " No do not drive . . . Opening MOD currently takes deposit. Have a ride to and from work."

  …

(ECF 72-2, at 110).

Deller provided this information to Herndon. (ECF 82, ¶ 75). Deller then opined that based on Yoder's responses, she did not believe that Yoder could perform any position in the store outside of Sales Associate with her restrictions because she could not perform the functions of a key-holding employee. (*Id.* ¶ 76; ECF 72-2, at 104). Herndon replied and agreed with Deller. (ECF 72-2, at 103). She then instructed Deller to let Yoder know she could move to a Sales Associate role or take an FMLA-protected leave of absence. (ECF 82, ¶ 77). Yoder eventually applied for and received 12 weeks of FMLA leave beginning on October 29. (*Id.* ¶ 82).[8]

---

[7] Yoder disputes that she wrote this, saying she merely answered the questions and Deller wrote the answers. (ECF 108, ¶ 73). But she does not dispute the accuracy of these statements, so the dispute is immaterial.

[8] Yoder later applied for Social Security disability benefits in January 2023. (ECF 78-13). Under penalty of perjury, Yoder represented that she became disabled and unable to work on October 29, 2022, the same day she took FMLA leave. (ECF 81, at 239–44).

Two days into her leave, Yoder's doctors faxed a note to Matrix that stated she "can work with restrictions" up to six hours per day using a walker. (ECF 74, at 56–58). The note made no mention of wheelchair use. (*Id.*).

**IV. <u>Yoder's Firing</u>**

In late November or early December, Deller went to the Berne store as part of an asset-protection investigation. (ECF 82, ¶¶ 83–84). Part of the investigation entailed pulling CCTV footage. (*Id.*). When Deller went to pull the footage for particular dates, she found that the store cameras had been disabled or tuned off on those dates. (*Id.* ¶ 84). Deller informed Dollar General's Regional Asset Protection Manager Holly Martin-Ruth ("Martin-Ruth") of this, and Martin-Ruth ordered Deller to investigate the cameras issue further. (*Id.* ¶¶ 84–85).

On December 14, Deller informed Martin-Ruth that a Store Manager at another location, Debra Gerber ("Gerber"), told her that Yoder was in the Berne store working while on FMLA. (*Id.* ¶ 86). Later that day, Deller went to the Berne store to review that day's footage to see if Yoder was on camera working. (*Id.* ¶ 88). But once again, Deller discovered the camera had been turned off earlier that day. (*Id.*). She then tried to pull the footage for the full previous week, only to find the camera was turned off on five of the seven days. (*Id.*). Deller even went back as far as October 1 and found that the cameras had been turned off once or twice per week. (*Id.* ¶ 89). Deller informed Martin-Ruth of these findings. (ECF 78-9, at 10). The next day, Gerber provided a signed statement that noted she had seen Yoder in the break room with Dennison—the Berne store's Assistant Store Manager—at 1:30 p.m. on December 14. (ECF 78-9, at 22).

While this investigation continued, Deller and Martin-Ruth noticed a suspicious transaction on December 17 and looked into whether Dennison had either stolen merchandise or rung up merchandise for herself in violation of company policy. (ECF 82, ¶¶ 90–92). Deller

reviewed the footage from that day, and the cameras had once again been turned off. (*Id.* ¶ 93). But the footage appeared to show Dennison turning off the cameras right before the transaction at issue. (*Id.* ¶ 93; ECF 78-9, at 23–24). Deller reported this to Martin-Ruth on December 20. (ECF 82, ¶ 94).

The next day, Martin-Ruth visited the Berne store with another Asset Protection Manager to investigate both Yoder, for working while on FMLA leave, and Dennison, for taking merchandise. (*Id.* ¶ 95). Deller was there as well but did not participate in the interviews. (*Id.* ¶ 96). When they arrived, Yoder—still on FMLA leave—was already there in a wheelchair and the cameras were unplugged. (*Id.* ¶ 97). Yoder claimed she was at the store to get lunch with Dennison and that the cameras were not working, but a ticket had been submitted. (*Id.* ¶ 98).

The investigating duo then interviewed Yoder. (*Id.* ¶¶ 99–100). During the interview, Yoder provided a handwritten statement admitting she went to the store during her leave and would offer help to customers if they asked her questions. (*Id.* ¶ 100; ECF 78-5, at 2). Yoder now claims this statement was coerced because she was threatened with discipline if she did not provide one. (ECF 108, ¶ 99). Statements were also obtained from Dennison and the two Lead Sales Associates, Lisa Ledesma ("Ledesma") and William Lake ("Lake"). (ECF 82, ¶ 102). Ledesma said Dennison told her to turn off the cameras that day, and showed Martin-Ruth a text with the instruction. (*Id.* ¶ 103). Ledesma also told Martin-Ruth that Yoder came into the store about once per week to recover and organize aisles, as well as answer questions from customers. (*Id.* ¶ 104; ECF 78-5, at 3). Lake wrote that Dennison asked him twice to unplug the CCTV so Yoder could work in the store, and that he saw Yoder recovering shelf and assisting customers. (ECF 78-5, at 4).[9]

[9] Yoder tries to counter these with a declaration that details what she claims Ledesma and Lake told her after giving their statements. (ECF 106-2, at 34). But neither Ledesma nor Lake was deposed. Nor did they provide sworn declarations. Thus, Yoder's testimony by declaration about these conversations is hearsay and inadmissible. Fed. R.

Finally, Dennison confessed in her written statement to taking merchandise and turning off the cameras about twice per week at Yoder's direction so Yoder could come in and be with them. (ECF 82, ¶¶105–106). She added that the cameras were working fine and no work order tickets had been submitted. (*Id.* ¶ 106). Martin-Ruth independently confirmed that the relevant system showed no work order tickets for camera technical issues had ever been submitted for the Berne store. (ECF 78-9, at 3). Dennison later testified in her deposition that her written statement was coerced, and that Martin-Ruth instructed her how to write it almost verbatim. (ECF 72-2, at 154–56). She said she disagreed with her prior statement that the cameras were turned off so Yoder could come in and be with them. (*Id.*, at 157). Dennison now says Yoder simply came in to buy employees lunch and spend time there, and that she had nothing to do with the cameras turning off. (*Id.*).

After these meetings, Martin-Ruth emailed Herndon to recommend that Yoder be fired based on the evidence she gathered. (ECF 82, ¶ 110). Herndon agreed, noting that Yoder should be fired based on evidence that Yoder was going to the store and working while on a leave of absence and instructing employees to turn off CCTV cameras when she did so. (*Id.* ¶ 111; ECF 72-2, at 128). Deller adopted this recommendation and fired Yoder. (ECF 82, ¶¶ 112–114). Wehrle did not participate in the decision to fire Yoder. (*Id.* ¶ 116; ECF 78-11, ¶ 16).

## LEGAL STANDARD

Summary judgment is appropriate if a moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 655–

Evid. 802(c); Fed. R. Civ. P. 56 (c)(4). And "a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

56 (2014). Put another way, a court will only grant summary judgment "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor." *Sorensen v. WD–40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015). When parties cross-move for summary judgment, courts must "construe all inferences in favor of the party against whom the motion under consideration is made." *Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018) (quoting *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018)).

When the non-moving party presents admissible evidence to a court that creates a genuine issue of material fact, that court must deny summary judgment. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). Courts do not supersede the jury's role in making credibility determinations and weighing the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And of course, "a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

## DISCUSSION

### I. ADA Claims

#### A. Failure to Accommodate

Yoder's failure to accommodate claim under the ADA requires her to show that: "(1) she is a 'qualified individual with a disability'; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability." *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 678 (7th Cir. 2010). The parties agree that Dollar General knew about Yoder's disability. But the parties contest whether Dollar General failed to reasonably accommodate her disability and whether Yoder was a "qualified individual with a disability."

Qualified individuals with a disability must be able to perform essential job functions with or without a reasonable accommodation. *Arroyo v. Volvo Grp. N. Am., LLC*, 93 F.4th 1066, 1069 (7th Cir. 2024); 42 U.S.C. § 12111(8). A "reasonable accommodation" is one that "allows the employee to complete the essential functions of the job in reasonable comfort." *Golat v. Skwierawski*, 184 F.4th 938, 953 (7th Cir. 2026). This does not mean an employer must provide employees their preferred accommodation. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). Nor do they need to "create a new job" or "shuffle job responsibilities among employees." *Golat*, 184 F.4th at 954 (quoting *Jay*, 233 F.3d at 1017).

Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." *Vargas v. DeJoy*, 980 F.3d 1184, 1188 (7th Cir. 2020) (quoting 29 C.F.R. § 1630.2(n)(1)). Whether a function is essential is a question of fact. *Id.* That question is resolved by "consider[ing] the employer's judgment, including written job descriptions, as evidence." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020). Courts also consider "the consequences of not requiring the employee to perform the function, the amount of time an employee actually spends performing the function, and the experience of those who previously or currently hold the position." *Id.* at 688. Although "deference is not absolute," courts "do not typically second-guess the employer's judgment on this call." *Vargas*, 980 F.3d at 1188.

The Defendants argue that Yoder was not a qualified individual with a disability because even with her requested accommodations, she could not perform her essential job functions. They also contend they reasonably accommodated Yoder because they extended her original leave, granted her in-store accommodations when she returned, and gave her the option of demotion or

FMLA leave when those accommodations proved ineffective.[10] Yoder insists she was a qualified individual with a disability. She further asserts that Dollar General could have reasonably accommodated her by allowing her to continue as Store Manager while using a wheelchair and delegating several of her key-holding job functions. The Court agrees with the Defendants.

After Yoder returned from extended medical leave in 2021, Dollar General went through the interactive process and granted Yoder reasonable accommodations. But those accommodations did not extend as far as she claims. When Yoder returned from leave and met with Smith in November 2021, Yoder herself noted that she would only need a walker or wheelchair to assist with mobility. Yoder stated no limitations on her ability to open and close the store. And while she was not cleared to drive yet and thus could not make bank deposits, Yoder expected these accommodations would be needed for six weeks or less.

In 2022, Dollar General learned that she could not perform several of her job's essential functions. When it became clear Yoder needed further accommodations, Deller met with her and went through her job description line by line. Yoder noted what she could do, what she could not do, what accommodations she would need, and signed off on it. Yoder said that she could not open the store, close the store, or drive to the bank to make deposits with the accommodations she requested. She had never previously disclosed to Dollar General that she could not open or close the store. It was then Dollar General learned she had delegated those duties to other employees. Deller shared this with Employee Relations. They conferred over it, and all agreed that she could not perform her duties as Store Manager given these limitations.

---

[10] Contrary to Yoder's assertion in her partial summary judgment motion, the arguments that the Defendants present in their briefs are defenses to her claims, not affirmative defenses.

Even then, Dollar General extended two reasonable accommodation options: take a temporary demotion to a Sales Associate role or take FMLA leave. Both options are legal. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 855 (7th Cir. 2019) ("A demotion can be a reasonable accommodation when the employer cannot accommodate the disabled employee in her current or prior jobs or an equivalent position."); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (employer can reasonably accommodate employee by offering extended leave).[11]

Nevertheless, Yoder contends her job's key-holding responsibilities (opening and closing the store and bank deposits) could be and had been effectively delegated. She insists that as a result, Dollar General's failure to grant her a wheelchair accommodation, which required delegating her key holding responsibilities, was not reasonable because these essential functions of her job were still getting done. While the key-holding responsibilities were being completed, that was only the case because Yoder delegated these responsibilities to other employees without authorization from Dollar General. This exceeded the accommodations they initially approved for a limited period of time. Having "another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013). Furthermore, Dollar General was not required to grant Yoder the wheelchair accommodation just because that was her preference. *Jay v. Intermet Wagner Inc.*, 233 F.3d at 1017.

By October 2022, Yoder's accommodations that had been in place for almost a year had proven ineffective. Her condition did not improve at the rate or in the way she told Dollar General to expect. And when Yoder went through the interactive process for the second time, she conceded

[11] This renders immaterial the parties' dispute over whether Yoder would have kept her health insurance if she chose demotion.

that with a wheelchair she could not perform several of her job's essential functions: personally opening the store twice per week, personally closing the store twice per week, and driving to the bank to make deposits. Thus, even with the wheelchair accommodations she sought, she could not perform the essential functions of her job. Her inability to do these essential functions even with the accommodations she wanted means she was not a qualified individual with a disability. It also makes her requested accommodations unreasonable. As such, Yoder cannot show that the Defendants failed to reasonably accommodate her disability. Further, the lack of issues arising from her delegation of these key-holder responsibilities—with no evidence showing her supervisors were aware this was happening—is irrelevant. Making other employees perform these essential functions for her would not be a reasonable accommodation. *Majors*, 714 F.3d at 534; *Golat*, 184 F.4th at 954.

Yoder also asserts that the Defendants' offer for her to take FMLA leave was not a "reasonable accommodation" because it would prevent her from effectively doing her job as Store Manager. In doing so, Yoder seems to contort "reasonable accommodations" and the caselaw to mean something they do not. When the case she cites, *Severson v. Heartland Woodcraft, Inc.*, says that "a long-term leave of absence cannot be a reasonable accommodation," it does not hold an employer's offer of such leave is an unreasonable effort to accommodate. 872 F.3d 476, 481 (7th Cir. 2017). Rather, *Severson* held that such a leave is not a "reasonable accommodation" that an employer is required to grant a disabled employee. *Id.* at 481–82. Yoder further insists that *Severson* holds accommodations must be effective at allowing her to do her job. But *Severson* held the opposite, as did the Supreme Court. *Id.* at 482 ("That reading of the statute equates "reasonable accommodation" with "effective accommodation," an interpretation that the Supreme Court has rejected."); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002). ("[I]n ordinary English the

word "reasonable" does not mean "effective." … Yet a demand for an effective accommodation could prove unreasonable….").

Yoder's makes additional counterarguments, but all are unavailing.[12] She asks the Court to take judicial notice of facts about Dollar General Store Manager's job responsibilities from a fifteen-year-old case Dollar General defended in Iowa. *Jones v. Dolgencorp, Inc.*, 789 F. Supp. 2d 1090, 1105 (N.D. Iowa 2011). While the facts of *Jones* are judicially noticeable, *see* Fed. R. Evid. 201(b)(2), they do not undisputedly establish facts here more than a decade later in a different state in a case with entirely different individual actors aside from the Defendant corporation. *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) ("The application of a previous finding to a latter proceeding must be beyond reasonable dispute before a court may take judicial notice.").[13]

Yoder further argues that the approved accommodations from 2021 did not preclude the use of a wheelchair and a jury could reasonably conclude that Yoder's wheelchair use was equivalent to the use of a walker that Dollar General approved. The Court disagrees. Yoder's approved accommodations were for occasional sitting breaks and the use assistive devices like walkers and shopping carts to help her walk, stand, stock and perform other physical tasks required of her job. They also envisioned her being able to personally open and close the store. While a

[12] As Defendants point out in their reply, Yoder improperly included several legal and evidentiary arguments in her response to Defendants' Statement of Material Facts that she does not address in her brief. (ECF 108). The Court disregards any such arguments unless they also appear in Yoder's briefs. N.D. Ind. L.R. 56-1(d) ("Disputes about the admissibility or materiality of evidence must be raised in the parties' briefs."); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528–29 (7th Cir. 2000) (affirming a district court can even strike fact responses that are "full of [legal] argument, evasion, and improper denials"). The Court also notices several facts which Yoder used to contest Defendants' Statement of Material Facts but never offered in her own Statements of Material Fact. The Court can and will disregard those as well. N.D. Ind. L.R. 56-1(b)(2)(D); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 644 (7th Cir. 2008).

[13] The Court rejects Yoder's other requests for judicial notice of additional dated cases involving Dollar General from different circuits for the same reasons.

wheelchair is a type of assistive device, Yoder admits it would not enable her to open and close the store. Nor could she walk or stand with only occasional breaks. These were tasks that her initial accommodations anticipated her being able to do.

Finally, Yoder contends that Herndon's email instructing Deller to have Yoder pick between leave or demotion proves Dollar General had a 100 percent healed policy, which would per se violate the ADA. In her view, this warrants summary judgment in her favor. This argument fails for two reasons.

First, the caselaw she cites does not support her position that evidence of a 100 percent healed policy warrants granting summary judgment to an employee. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998); *McGregor v. AMTRAK*, 187 F.3d 1113, 1116 (9th Cir. 1999). Those cases merely held that such allegations could survive an employer's motion for summary judgment. *Id.* Yoder provided more cases in response to Defendants' motion, but none establishes summary judgment in her favor would be appropriate either. *Steffen v. Donahoe*, 680 F.3d 738, 748 (7th Cir. 2012) (100% healed policy would violate the ADA, but employee lacked standing because he was not disabled); *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 (7th Cir. 2011) (same); *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653–54 (6th Cir. 2001) (reversing summary judgment in favor of an employer).

Second, the email Yoder points to does not prove what she claims it does. Dollar General had already accommodated her once, disproving the notion of a standing 100 percent healed policy. The email also does not say she must be "fully healed." It merely says that if Yoder chooses to take a leave of absence, it would last until her leave runs out or her restrictions were lifted. This did not say or imply Yoder needed to be fully healed for her restrictions to be lifted. In context, Dollar General discovered Yoder had several new limitations previously unknown to them, which

that very email chain shows led them to conclude required a re-evaluation of the feasibility of her accommodations.

In sum, no reasonable jury could find that Yoder was a qualified individual with a disability, or that Dollar General failed to reasonably accommodate her.[14] Because Yoder cannot prove these elements, her partial motion for summary judgment will be DENIED and the Defendants' motion for summary judgment on the ADA failure-to-accommodate claim will be GRANTED.

### B. <u>Discrimination</u>

To establish her ADA discrimination claim, Yoder must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that her disability caused the adverse employment actions. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021).

Yoder's discrimination claim fails for several reasons. First, as the Court has explained, no reasonable jury could conclude Yoder was "otherwise qualified" to perform the essential functions of the job with or without reasonable accommodation. Dollar General gave her reasonable accommodations, and she could still not perform her job's essential functions.

Second, the causation element is a "but for" test. So Yoder must show that Dollar General "would not have fired h[er] but for h[er] actual or perceived disability; proof of mixed motives will not suffice." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). Yoder cannot do so.

---

[14] The Court need not address Yoder's argument about Defendants' purported failure to prove the "undue hardship" exception because it "does not come into play absent a determination that a reasonable accommodation was available." *Severson*, 872 F.3d at 480 n. 1 (citing 42 U.S.C. § 12112(b)(5)(A)).

There are two ways the Court may analyze Yoder's discrimination claim. First, the Court may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Second, the Court may also simply ask whether a reasonable juror could conclude that Yoder would have kept her job if she was not disabled, and everything else had remained the same. *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (quoting *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)). The parties address both in their briefs, so the Court will use both as well.

Under *McDonnell Douglas*, Yoder must first set forth a prima facie case of discrimination. 411 U.S. at 802. To do this, Yoder must show that (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). If Yoder can make this prima facie showing, the burden then shifts to the Defendants to "present a legitimate, non-discriminatory reason" for the adverse employment actions. *Id.* Finally, if the Defendants carry their burden, then Yoder must show that the reason they offered is pretextual. *Id.*

Yoder cannot state a prima facie case. For reasons already explained, she did not perform her job to Dollar General's expectations. Further, not only has she failed to identify any similarly situated non-disabled individuals who received better treatment; she has identified no comparators at all. To the extent she tries to imply that managers of other stores rated "not customer ready" are comparators, she provides no evidence that any of them violated workplace rules like the Defendants claim she did.

Even if a prima facie case could be stated, Yoder would still fall short. In cases "[w]here legitimate expectations and pretext overlap," the Court "can be more efficient by addressing both

together rather than first determining whether there is a *prima facie* case of discrimination and then turning to pretext." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). "If the employer offers a non-discriminatory reason for the termination and we determine the reason is not pretextual, we can skip the remaining analysis of the prima facie case." *Id.* Pretext "means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). A plaintiff "must demonstrate pretext by a preponderance of the evidence." *Brooks*, 39 F.4th at 435. If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). In other words, "the only question is whether the employer honestly believed it had a non-discriminatory reason" for its adverse actions. *Brooks,* 39 F.4th at 436.

Defendants assert they fired Yoder for violating their Wage & Hour policy and their Code of Business Conduct by working while on FMLA leave and instructing employees to turn off store cameras while she did so. The record reveals ample evidence to support that belief. Gerber reported that Yoder was in the break room at the Berne store while on leave to Dollar General higher ups. Martin-Ruth investigated the allegation and gathered evidence that bolstered her claim. This included witness testimony, signed and dated statements from those witnesses, store video records, and text messages. Contemporaneous emails confirm this timeline of events and support that this provided Dollar General's reason for terminating Yoder. While Yoder disputes that the part of the Wage & Hour policy which forbids working off the clock applied to her, and even if it did, she disputes whether she actually worked while off the clock, both disputes are immaterial. The record shows Defendants honestly believed the policy applied to Yoder, and evidence exists which supports the conclusion she violated it. That is what counts. *Id.* Thus, Defendants had a legitimate, non-discriminatory reason for firing Yoder.

In response, Yoder offers no admissible evidence that could support the finding of pretext. She insists that the statements Martin-Ruth obtained from witnesses were coerced and thus unreliable. In her view, this means those statements could not have supported the Defendants' conclusion Yoder worked while on leave. This is wrong. Yoder can say this about Dennison, who testified as much in her own deposition. But Yoder has offered no admissible evidence that indicates Ledesma and Lake's statements were coerced.[15]

Even if all three statements were coerced, Martin-Ruth did not fire Yoder: she only made a recommendation. Herndon and Deller—who were involved in the investigation but not the interviews Yoder takes issue with—made the ultimate call and communicated that to Yoder. Nothing in the record suggests Herndon and Deller could have known these statements were coerced when they made the decision to terminate Yoder, so this does not establish that the Defendants' reasoning is pretextual. *See Blockhus v. United Airlines, Inc.*, No. 24-1043, 2024 WL 4234658, at *3 (7th Cir. Sept. 19, 2024), *cert. denied,* 145 S. Ct. 2684 (2025) (employer could not consider evidence it did not have when making the decision was made).

Other stray pieces of evidence she can point to prove similarly unavailing. Wehrle's alleged comment about Yoder's wheelchair from April 2022 is immaterial because she played no role in the decision to fire her. Yoder's speculation about Gerber's motives that came from other unnamed sources is inadmissible hearsay. Fed. R. Evid. 802(c). Everything left is just Yoder's guesswork. "Guessing at an employer's hidden animus or inner prejudice, however, is not enough to defeat summary judgment. The employee must support her hunch with evidence." *Brooks*, 39 F.4th at 436. Here, Yoder has not.

[15] *See* footnote 9 of this opinion.

For these reasons, no reasonable jury could conclude that the Defendants would not have fired Yoder but for her disability. Defendants honestly believed she violated company policies. Yoder has offered nothing to suggest this was cover for a discriminatory motive. Thus, Yoder's partial motion for summary judgment on her ADA discrimination claim will be DENIED and Defendants' motion for summary judgment will be GRANTED.

## II. FMLA Interference Claim

To prove her FMLA interference claim, Yoder must show that: (1) she was eligible for FMLA protections; (2) Dollar General was covered by the FMLA; (3) Yoder was entitled to take leave under the FMLA; (4) Yoder provided sufficient notice of her intent to take leave; and (5) Dollar General "interfered with, restrained, or denied FMLA benefits to which he was entitled." *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023) (citation omitted). Only the last element is disputed.

In response to the Defendants' motion, Yoder abandoned the portion of her FMLA interference claim that accused Defendants of interfering with her future FMLA rights by forcing her to take unnecessary FMLA leave. That means Yoder's only remaining basis for her FMLA claim is that Dollar General fired her for the "bogus reason" of working while on FMLA leave and not returning her to her job as Store Manager. To survive summary judgment, Yoder must show that "a jury could find that the defendants did not reinstate [her] because she exercised her right to take FMLA leave." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). She cannot do so.

As the Court has already explained, evidence in the record does not support Yoder's contention that the Defendants' reason for firing her was "bogus." They honestly believed she violated company policy and had a legitimate basis for reaching that conclusion. The FMLA "only

entitles employees to the same position they would have otherwise been entitled to." *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009) (citing 29 U.S.C. § 2614(a)(3)(B)). Because of this, "an employer may terminate employees—even when on leave—if the employer discovers misconduct that would justify termination had leave not been taken." *Id.*

Of course, Yoder's specific misconduct—working while on leave—could not have occurred had she not taken leave. But she violated Dollar General's Wage & Hour policy that broadly prohibits working while off the clock. The policy explicitly states that violating it can result in termination, even for a first offense. Thus, when Yoder committed a terminable offense while on FMLA leave, she was no longer entitled to reinstatement as Store Manager.

Yoder also offers no evidence to support an assertion that the Defendants fired her rather than reinstating her because she took FMLA leave. All evidence Yoder identifies in her briefs implying improper motives on the Defendants' part are geared toward her discrimination allegations. Nowhere does she identify any facts which would tie her firing to her electing to take leave. The fact that Dollar General presented the FMLA leave to her as an ADA accommodation further undercuts any argument to that effect. *Cf. Davis v. ArcelorMittal USA, LLC*, No. 2:18 CV 318, 2021 WL 848106, at *9 (N.D. Ind. Mar. 5, 2021).

No reasonable jury could conclude that the Defendants interfered with Yoder's FMLA rights. Thus, Defendants' motion for summary judgment on Yoder's FMLA interference claim will also be GRANTED.

## CONCLUSION

Yoder's motion for partial summary judgment (ECF 70) is DENIED. Defendants' motion for summary judgment (ECF 77) is GRANTED.

**SO ORDERED** on September 30, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT